**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

OMAR JOHNSON, *et al.*                                    :

    Plaintiffs                                           :

v                                                        :          Civil Action No. JFM-06-3287
                                                                    (Consolidated cases:
COMMISSIONER OF CORRECTION           :          JFM-06-3288, JFM-06-3307,
                                                                    JFM-06-3310,          JFM-06-3352,
    Defendant                                        :          JFM-06-3353 and JFM-06-3401)

o0o

## MEMORANDUM

Pending in the above-captioned consolidated civil rights case is defendant's motion for

summary judgment. Paper No. 27. The motion is opposed by plaintiffs. Papers No. 29 and 30.

Upon review of the papers filed, the court finds a hearing in this matter unnecessary. *See* Local Rule

105.6 (D. Md. 2004).

### Background

Plaintiffs are inmates who were confined at the Maryland House of Correction Annex, now

known as Jessup Correctional Institution (JCI). On August 3, 2005, plaintiffs were removed from

general population and transferred to North Branch Correctional Institution (NBCI). Paper No. 1

at p. 5. They were not permitted to bring their property with them and were required to wear orange

jumpsuits in place of their own clothing. *Id*.

Upon arriving at NBCI, plaintiffs allege they were required to submit to a strip search while

surrounded by correctional officers dressed in tactical gear. *Id*. Plaintiffs were required to strip

nude, bend over at the waist and spread their buttocks. *Id*. They allege the search was video-taped.

*Id*.   While confined at NBCI, plaintiffs allege they were kept in isolation, were not permitted

recreation time or showers on the weekends, provided only two showers a week, and restrained

anytime they left their cells. *Id*. They claim they were placed on "locked down status" and required

to remain in their cells 23 hours a day on weekdays and 24 hours a day on weekends. *Id*. at p. 6. They claim outdoor recreation that was provided occurred in a room consisting of four walls and metal grill ceiling. They did not receive time in the law library, congregate religious worship or the benefit of any educational or vocational programming. All visits were non-contact. Plaintiffs claim they were subjected to strip searches and body cavity searches on a regular basis. *Id*. Plaintiffs admit that some of their property was returned at NBCI, but allege most of it was damaged or destroyed. *Id*.

Defendant asserts that 64 inmates were removed from JCI because of an increase in inmate violence. Paper No. 27 at Ex. 1. The project to quell the prison violence was called Operation NorthStar. *Id*. The inmates selected for transfer were identified through intelligence as having some connection to a gang, had a bad adjustment history, had possessed contraband, or had previously compromised security. *Id*. The inmates were transferred in closely monitored groups. *Id*. From February 7 to March 3, 2005, JCI was locked down because of a series of stabbings. *Id*. An inmate was murdered on or about May 27, 2005, and the prison was again locked down until July 11, 2005. *Id*. The transfers at issue here began roughly three weeks later.

When plaintiffs were transferred to NBCI they were searched and the searches were videotaped. *Id*. at Ex. 4. Defendant asserts, however, that inmates were not filmed in the nude; no personal body parts were videotaped and no body cavity searches were conducted. *Id*. The purpose of the video taping was to document any pre-existing injuries. *Id*. Defendant further alleges that plaintiffs were provided access to the administrative remedy procedure and an orientation guide. *id*. at Ex. 6. Defendant also asserts that officers assigned to NBCI completed approved training.

Defendant admits plaintiffs were required to wear shackles during outdoor recreation periods

2

and groups were limited to two or three inmates. *Id.* at Ex. 7. The practice was later changed so that

plaintiffs were not required to wear shackles and the group sizes were increased to approximately

20 inmates. *Id.* Outdoor recreation took place outside in two large open-air rooms measuring 31'

by 32', with 3 windows and an open ceiling covered with metal mesh. Recreation was provided for

one hour per day on weekdays and may be taken outside or inside at the choice of the inmate. In

addition, plaintiffs were allowed one fifteen minute phone call per week. *Id.*

**Standard of Review**

Fed. R. Civ. P. 56(c) provides that:

> [Summary judgment] shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled to
> a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat

the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon

the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing

that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d

514, 525 (4th Cir. 2003) (alternation in original) (quoting Fed. R. Civ. P. 56(e)). The court should

"view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her

favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).  The court has an obligation to ensure that factually unsupported claims and defenses do not go to trial.  *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U. S. 317, 323-24 (1986)).

## Analysis

Prisoners do not have a constitutional right to access programs or to demand to be housed in one prison verses another.  "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976).  Under the Supreme Court's pronouncement in *Sandin v. Conner*, 515 U.S. 472 (1995), the focus on mandatory language in prison regulations was rejected.  A liberty interest may be created when state action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" without regard to mandatory language in prison regulations.  *Id.* at 484.  Thus, the due process

inquiry must focus on the nature of the deprivation alleged and not on the language of particular prison regulations. *Id.* Following the reasoning of the Supreme Court in *Sandin*, a liberty interest is not implicated when prisoners are placed on administrative segregation. *See Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997); *Reffitt v. Nixon*, 917 F. Supp. 409, 413 (E.D. Va. 1996).   It is not "atypical" for inmates to be placed on administrative segregation for any number of reasons. *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Plaintiffs in the instant case have not alleged that the conditions of segregation were significantly more onerous than those of general population. *See Beverati,* 120 F.3d at 504 (conditions of administrative segregation at Maryland Penitentiary); *Knox v. Lanham*, 895 F. Supp. 750, 758-59 (D. Md. 1995) (administrative segregation at Eastern Correctional Institution).  Any violations of Division of Correction directives in connection with their placement and retention on administrative segregation do not amount to a violation of a constitutionally protected right.

Plaintiffs contrast the conditions of their confinement at NBCI with the conditions of their confinement at JCI prior to their transfer.  Notably different are permitted recreation and out of cell time, access to programs, and access to property.  Plaintiffs assert that prior to their transfer they were general population inmates who were confined to their cells for 11 hours a day during the week and 7 hours on the weekends. Papers No. 29 and 30 at p. 8.  They point out that they were permitted to leave their cells without restraints and that recreation times, which occur three times a day, included time for educational programs, library, gym, religious services, showers and medical access.   While the limitation on their movement and the curtailment of out-of-cell time was more restrictive, the conditions are not atypical of prison life.  Indeed, prior to the transfers JCI was frequently on lock down status due to violent inmate attacks.   "Conditions must not involve the

wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity

of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  As

evidenced by the absence of any injuries, the conditions described by plaintiffs do not begin to

approach a wanton and unnecessary infliction of pain. *See Strickler v. Waters*, 989 F. 2d 1375, 1381

(4th Cir. 1993) (absence of serious or significant injury establishes prisoner not subjected to cruel

and unusual punishment).

Plaintiffs further assert that they did not contribute directly or indirectly to the increased

violent behavior occurring at JCI requiring mass transfers and that there was no legitimate security

reason for their transfers.  Defendant has not provided specific information regarding the rationale

for transferring each plaintiff, but provides instead a generalized statement regarding the transfers.

There is no constitutional requirement that a legitimate penological justification be made for a

transfer to another prison, even where the conditions are more restrictive.  To the extent that

applicable regulations were not observed in the context of the transfers, non-compliance with those

regulations does not establish a constitutional violation.  Notwithstanding the lack of a specific

explanation, the existence of escalating gang related violence which resulted in the death of an

inmate was adequate rationale for transferring a large group of inmates from that facility.  It is not

for this court to second-guess the security measures taken by correctional officials; certainly

violence of the sort occurring at JCI warranted definitive action.  Plaintiffs' assertion that the prison

they were transferred to was  not fully operational does not change the analysis.[1]

The strip searches to which plaintiffs were subjected also do not rise to the level of an

---

[1] Plaintiffs state there was no "official legal authority appointed to NBCI until November 9, 2005."  Paper No.29 and 30 at p. 3.  There is no constitutional requirement for prisoners to be confined in a prison that is supervised by a permanently appointed, as opposed to an interim warden.

atypical and significant hardship even when it is assumed plaintiffs were in view of female officers during the search and it was video taped.  A one-time exposure to members of the opposite sex, such as that alleged in this case, does not run afoul of the Constitution.  *See Hudson v. Goodlander*, 494 F. Supp. 890, 891 (D. Md. 1980) ( "[N]either an inadvertent encounter nor a regularly scheduled visit by a female employee as an announced time . . . rises to a level of a constitutional deprivation.").  Moreover, defendant is not vicariously liable for conduct of his employees.   The doctrine of *respondeat superior* does not apply in Section 1983 claims. *See Nedd v. Correctional Medical Services*, Civil Action No. JFM-92-1524 (D.Md., October 22, 1992), *citing Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *McIlwain v. Prince William Hospital*, 774 F.Supp. 986, 990 (E.D.Va. 1991).

Even if the individual officers conducting the searches had been named as defendants, the claim fails.  A defendant is entitled to avail himself of a qualified immunity defense when at the time of the claimed violation the right asserted was not clearly established and a reasonable person in the official's position would not have known that his conduct violated that right. *See Rish v. Johnson*, 131 F. 3d 1092, 1095 (4th Cir. 1997).  The policy in place regarding strip searches clarifies that video taping is only used to document pre-existing injuries and is not to include pictures of inmates' genitalia.  Paper No. 27 at Ex. 2, pp. 8– 9.   Strip searches are a regular part of legitimate prison security.  Requiring plaintiffs to be strip searched as part of the transfer was not outrageous conduct. *See e.g., Fillmore v. Page*, 358 F. 3d 496, 505-6 (7th Cir. 2004) (discrete and expeditious strip search not unconstitutional because it is videotaped). Thus, even if the officers who conducted the search were defendants in this action, they would be entitled to avail themselves of a qualified immunity defense.

Prisoners have a constitutionally protected right of access to the courts. *See Bounds v. Smith*, 430 U. S. 817, 821 (1977).  However:

> *Bounds* does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims.  The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U. S. 343, 355 (1996).

To the extent that plaintiffs were temporarily deprived of access to legal material, there has been no showing of harm resulting from that deprivation.  "Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.' *O'Dell v. Netherland*, 112 F. 3d 773, 776 (4th Cir. 1997) *quoting Lewis*, 518 U. S. at 355.  "The requirement that an inmate alleging a violation of *Bounds* must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis*, 518 U.S. at 349.  There has been no allegation that a deadline was missed or any of the plaintiffs were unable to pursue a meritorious claim.

Plaintiffs' claims regarding the destruction of their property does not state a constitutional claim.  In the case of lost or stolen property, sufficient due process is afforded to a prisoner if he has access to an adequate post-deprivation remedy. *See Parratt v. Taylor*, 451 U. S. 527, 542-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U. S. 327 (1986).  The right to seek

damages and injunctive relief in Maryland courts constitutes an adequate post deprivation remedy.[2]

*See Juncker v. Tinney*, 549 F. Supp. 574, 579 (D. Md. 1982).[3]

### Conclusion

The undisputed facts in this case establish no basis for a finding that plaintiffs' constitutional rights were abridged.  Defendant is, therefore, entitled to summary judgment which shall be granted by separate order which follows.

December 10, 2007                                           /s/
Date                                                                   J. Frederick Motz
                                                                           United States District Judge

---

[2]Plaintiffs may avail themselves of remedies under the Maryland's Tort Claims Act and through the Inmate Grievance Office.

[3]Although *Juncker* dealt with personal injury rather than property loss, its analysis and conclusion that sufficient due process is afforded through post deprivation remedies available in the Maryland courts also applies to cases of lost or stolen property, given *Juncker's* reliance on *Parratt* in dismissing plaintiffs' due process claims.